WILLIAMS, J.
_JjThe plaintiff, Louisiana Capital Partners, L.L.C., and third-party defendant, Mark Goff, appeal a judgment in favor of the defendant/plaintiff-in-reconvention, Thomson General Contractors, Inc. The trial court awarded the defendant damages of $99,816.06 and recognized a lien in favor of the defendant for the judgment amount. For the following reasons, we affirm.
FACTS
Louisiana Capital Partners, L.L.C. (“LCP”) is the owner of a building located at 6540 Line Avenue in Shreveport. LCP has two members with equal ownership interests, Mark Goff (“Goff’) and Walter Ledig (“Ledig”). In February 2007, LCP submitted a proposal to the federal government to lease the premises to the U.S. Department of Agriculture (“USDA”) for use as office space. Goff then discussed the project with John R. Thomson, Jr. (“Thomson”), a construction contractor and *416 owner of Thomson General Contractors, Inc. (“TGC”). In a letter dated October 4, 2007, Thomson wrote to Goff and Ledig that TGC offered to “furnish all material, labor, equipment, subcontractors, permits, insurance, supervision and construction management for bringing your project on Line Ave. to the shell stage for the sum of all cost (material, labor, ... overhead, etc.) plus a fee of 4%.” Under Thomson’s signature is the handwritten word “accepted” and the signature of Mark Goff.
A short time later, TGC began demolition of the interior of the building. This work included placing chutes outside of the windows and trash dumpsters in front of the building. On December 21, 2007, TGC ^submitted its first invoice to LCP in the amount of $84,361.07, which included the cost of demolition and the contractual contractor’s fee through that date. TGC issued a second invoice on March 24, 2008, in the amount of $47,909.74, for demolition and the contractor’s fee. That same month, Goff made a payment by check to TGC in the amount of $20,000, drawn on the escrow account of LCP’s counsel, James Bodenheimer. On September 10, 2008, TGC submitted a final invoice in the amount of $119,816.06, the total cost for all of the work performed at the site. When payment was not received, TGC filed a lien against the property that was recorded in the Caddo Parish mortgage records.
Subsequently, the plaintiff, LCP, filed a petition for damages against the defendant, TGC, alleging unauthorized demolition. LCP also filed a rule to cancel TGC’s lien filed against the property. TGC then filed a reconventional demand against LCP and a third party demand against Goff and Ledig, seeking recovery of $99,816.60, the net amount due after a credit for the prior payment, and enforcement of the lien. Ledig was later dismissed from the action.
After a trial, the court issued written reasons for judgment, finding that a valid contract existed and that the demolition work performed by TGC was authorized. The court noted the evidence showing that Goff and Ledig were aware of the demolition work being done, including the contemporaneous emails, field reports and the lack of written response to TGC’s invoices by the principals of LCP. The trial court rendered judgment ordering LCP and Goff, in solido, to pay damages of $99,816.06 for ^demolition work performed and recognizing the lien in favor of TGC. LCP and Goff filed a motion for new trial, which was denied. The appellants, LCP and Goff, appeal the judgment.
DISCUSSION
The appellants contend the trial court erred in awarding damages to the defendant for demolition work. Appellants argue that they do not owe payment because the defendant failed to show that they entered a contract with or authorized defendant to perform demolition in the building.
A contract is an agreement by two or more parties whereby obligations are created, modified or extinguished. LSA-C.C. art. 1906. A contract is formed by consent of the parties established through offer and acceptance, which may be made orally, in writing or by action or inaction that under the circumstances indicates consent. LSA-C.C. art. 1927. The determination of the existence of a contract is a finding of fact not to be disturbed unless clearly wrong. Dubois Construction Co. v. Moncla Construction Co., Inc., 39,794 (La.App.2d Cir.6/29/05), 907 So.2d 855.
In the present case, Goff testified that his occupation was “health care” and that he was an equal co-owner of LCP with Walter Ledig. Goff stated that LCP origi *417 nally bought the building on Line Avenue for use as a health care facility, but then that project was halted for lack of funds. Goff testified that Ledig later raised the idea of leasing the building to the federal government for office space. Goff stated that LCP submitted a proposal to the government, which agreed in September 2007 to lease the building after extensive renovations were made. Goff testified that he then spoke with RThomson about the project and showed him LCP’s proposal, the government’s requirements and LCP’s estimate of construction costs. Goff stated that he understood the October 2007 letter from Thomson as just a statement that the price of shell work would be cost plus 4% and the price of tenant improvements would be cost plus 5%. He testified that the government required the letter to show that LCP had a contractor and an architect “available” to do the project. Goff stated that he informed Thomson on several occasions that LCP would not be able to pay TGC anything until funding was obtained from a bank. Goff acknowledged that in November 2007 he was informed by Ledig that TGC workers were taking down some ceilings and walls in the building. Goff testified that he then telephoned Thomson and told him to stop any demolition because LCP did not have funding or a final contract with the government. Goff stated that he was told by Ledig about the TGC invoices submitted in December 2007 and March 2008. Goff stated that after each invoice, he phoned Thomson and told him to stop the demolition because LCP did not have any funding for such work.
During his testimony, Goff explained that the building’s lower floor was below ground, the upper floor was at ground level and that the project involved the top floor. Goff asserted that although he visited the building at least two times between October 2007 and the date LCP filed suit, he did not enter the top floor. Goff testified that on his first visit, he went to the rear of the building to pick up a metal shed that had been loaded onto a trailer by TGC workers. On the second visit, he entered the bottom floor to | slook at the electrical circuit box and spoke to some TGC workers who were present. Goff stated that he had given TGC permission to use the building to make cabinets and that he did not see any indication of demolition activity on either of his visits. Goff testified that in March 2008, Thomson said that he was short on cash and needed to borrow money. Goff stated that he agreed to loan $20,000 to Thomson, who did not mention that the money would be a partial payment for the amount owed for demolition. Goff stated that his attorney prepared a promissory note, but could not recall if Thomson ever signed the original note.
Walter Ledig testified that he became co-owner of LCP in 2006 and told Goff about the possibility of leasing the building on Line Avenue to the federal government for office space. Ledig stated that he signed the February 2007 proposal submitted to the government estimating the total project cost as approximately $2 million. Ledig testified that he consented to Goff signing the October 2007 letter, which he understood as stating the price that the contractor “would charge once the contract was secured” with the government. Ledig stated that based on Thomson’s July 2008 estimate that the total cost of the project would be approximately $6 million, he did not believe that the building would support a loan of that amount without a substantial increase in the government’s lease payments.
Ledig acknowledged that when he entered the building on November 13, 2007, he saw TGC workers tearing out some ceilings and walls, but did not tell them to *418 stop. Ledig stated that instead, he contacted Goff and asked him why the workers were there when they could not be paid. Ledig |fiasserted that he “just forgot” about the matter after Goff said the TGC workers were not supposed to be there and he would contact Thomson. Le-dig testified that he did not drive by the building again until two months later, when he saw a TGC sign and trucks in front of the building and a chute extending from a window. He stated that he again called Goff to ask why the TGC workers were still in the building and was told that maybe they were doing cabinet work. Le-dig testified that although he was upset after receiving the December 2007 invoice because he thought the TGC workers were out of the building, he did not speak with Thomson but called Goff, who said he would take care of the bill and that it was not owed. Ledig stated that after he received the second invoice in March 2008, he again asked Goff about the situation and he said TGC was not supposed to be doing demolition.
Randy Berry testified that as TGC’s construction superintendent for the project, he prepared daily field observation reports for every work day. Berry stated that his notes showed that on November 13, 2007, Ledig entered the building while demolition was occurring. Berry testified that Ledig did not express any concern about the demolition and that he did not tell the TGC workers to stop or that they were not authorized to be there.
John Thomson testified that he had been operating his company, TGC, for ten years and had more than 30 years of experience in the construction industry. Thomson stated that he prepared the October 2007 letter, which provided that TGC would perform all of the work required to bring the project to the shell stage for cost plus a 4% fee. Thomson testified |7that he addressed the letter to Goff and Ledig because he did not find out until later that they were members of LCP, which owned the building. Thomson stated that TGC’s demolition showed the location of existing electrical wiring and plumbing and helped determine where walls would be placed.
Thomson testified that Goff and Ledig knew that TGC was doing demolition in the building. Thomson stated that he had spoken about the demolition with Goff, who had called after Ledig asked about the removal of a ceiling, and told him that some of the ceiling had come down because it was attached to a wall being removed. Thomson testified that during the period of November 2007 to September 2008, Goff had been in the building several times while demolition was occurring and had never instructed TGC to cease work. Thomson stated that the only instruction from Goff and Ledig was not to build anything new. Thomson testified that he was aware that LCP would not complete the whole project of shell work and tenant improvements unless financing was obtained, but that he never made payment for the demolition contingent on whether LCP signed a final lease with the government. Thomson stated that in December 2007 and March 2008, he had submitted invoices to LCP reflecting the costs of labor and equipment plus a 4% markup consistent with the October 2007 agreement. He testified that neither Goff nor Ledig denied the amounts were owed or told TGC to stop work after receiving those invoices. Thomson stated that after sending the second invoice, he told Goff that TGC needed some money toward the amount owed and Goff paid $20,000. Thomson testified that this Inpayment was not a loan and that he did not sign a promissory note. He acknowledged that the $20,000 was not shown on the final invoice sent in September 2008. Thomson explained that Goff had said not to men *419 tion the payment to Ledig, who was supposed to write the checks for LCP.
The record shows that in the letter of October 2007, Thomson offered to provide all labor, material and equipment needed “for bringing your project on Line Ave. to the shell stage” in return for payment of the cost of those services, plus a 4% fee. Goff, with Ledig’s consent, wrote the word “accepted” and signed the document. Thus, the trial court could have reasonably found that LCP had agreed to pay for work performed by TGC concerning the project.
TGC submitted invoices for work done and there is no dispute that TGC performed demolition in the building. However, appellants argue in their brief that TGC is not entitled to payment for such work because the written agreement was for the entire project and did not include demolition. We note that the trial testimony shows that demolition was part of the work necessary to reach the shell stage of the project. Thus, the terms of the agreement included the costs of the demolition performed.
Despite the written agreement, the appellants argue that they do not owe payment for the demolition because Thomson knew that TGC would not be paid anything unless LCP signed a lease with the federal government and obtained financing for the project. Appellants further argue that the demolition was not authorized because Thomson was told repeatedly to stop any work being done and they were not required to repeat their instruction 19in writing.
Contrary to the appellants’ argument, there is no language in the October 2007 written agreement making the payment to TGC for work performed contingent on whether LCP signed a lease with the federal government or obtained financing. In addition, the trial court heard conflicting testimony on the issue of whether the demolition by TGC was authorized. Goff maintained that Thomson was told not to start any work until financing was approved by the bank and then was told to stop any demolition being done. Thomson testified that he once spoke with Goff about not removing more ceiling area than was necessary, but that Goff and Ledig were aware of the demolition and did not instruct TGC to stop. Both Ledig and Goff were admittedly aware as early as November 2007 that TGC was performing demolition in the building.
After hearing the testimony, the trial court could have found that a reasonable person, facing the same situation as Goff and Ledig, would have delivered at least a single written notice instructing TGC to cease demolition either after the November 2007 visit to the building or after receipt of the December 2007 invoice, if the demolition was actually not authorized. Additional evidence supports the finding that the demolition was authorized, including the March 2008 payment of $20,000 by check payable to TGC, not Thomson personally, from the escrow account of LCP’s attorney and Berry’s report of December 20, 2007, noting that the owner wanted cabinets and fixtures that would not be used in the new construction to be placed in the basement.
110The trial court considered the evidence and weighed the credibility of the witnesses. Based upon this record, we cannot say the trial court was clearly wrong in finding that the October 2007 letter constituted an agreement authorizing TGC to perform demolition and obligating the appellants to pay TGC for the work performed. Consequently, the trial court did not err in awarding TGC the amount of $99,816.06 and denying the claims of LCP. Thus, the assignment of *420 error lacks merit. In reaching this conclusion, we pretermit discussion of the appellants’ assignment of error regarding their claim to recover for damage to the building.
We note that although the appellants’ brief includes an assignment alleging that the trial court erred in failing to order cancellation of the lien filed by TGC, the appellants have effectively waived this assignment by failing to present argument and stating that if they are unsuccessful on appeal, “the amount due will simply be paid and the lien accordingly cancelled.” Pursuant to URCA Rule 2-12.4, we consider this assignment of error as abandoned.
CONCLUSION
For the forgoing reasons, the trial court’s judgment is affirmed. Costs of this appeal are assessed to the appellants, Louisiana Capital Partners, L.L.C. and Mark Goff.
AFFIRMED.